Filed 7/25/14  P. v. Valencia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047798 |
| v. | (Super. Ct. No. 09CF3144) |
| JUANA PEREZ VALENCIA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Reversed.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Juana Perez Valencia of second degree murder (count 1) and assault on a child with force likely to produce great bodily injury causing death (count 2). The trial court sentenced defendant to 15 years to life on count 1, and dismissed count 2 for sentencing purposes.

Defendant contends the trial court erred by improperly restricting one of her expert witness's testimony; and by failing to instruct the jury on misdemeanor assault in relation to involuntary manslaughter as a lesser included offense to count 1, and as a lesser included offense to count 2. We agree with both contentions and reverse.

**FACTS**

*Prosecution Evidence*

Defendant came to the United States in 2006 when she was 16 years old. She lived with her sister, her sister's husband, and their two children, and her brother, his wife, and their two children in a two bedroom apartment in Anaheim. Defendant and her sister worked at Sombrero's restaurant.

In the fall of 2009, defendant was 19 years old and in 11th grade. In September, defendant's dance teacher noticed she had gained weight in her abdomen. Suspecting defendant might be pregnant, the teacher notified a school counselor and sent defendant to the office. Defendant returned to dance class the next day, but started wearing a hooded sweatshirt in class.

In October, a school counselor, who had known defendant for over two years, asked defendant if she was pregnant. Defendant denied being pregnant and attributed her appearance to a summer weight gain. Defendant said she had taken a pregnancy test and the results were negative.

In November, defendant's English teacher suspected defendant might be pregnant. The teacher offered to help defendant find resources if she was expecting, but she denied it. Around the same time, a school health technician asked defendant if she was pregnant, and again she denied it.

2

On December 11, the health technician and the counselor once more talked to defendant about being pregnant. They both told defendant she needed to obtain prenatal care for herself and the baby if she was pregnant. They also told her she could continue her education and receive free nutrition services from the school during her pregnancy and after delivery. They encouraged her to talk to her sister and to seek medical care. She denied being pregnant, but promised to see a doctor that weekend.

Four days later, the counselor called defendant into her office to find out what she had done. Defendant reported she had not seen a doctor over the weekend, but had scheduled a doctor's appointment for December 17.

On December 18, the counselor learned defendant had not talked to her sister or seen a doctor. The counselor again tried to persuade defendant to seek medical treatment as soon as possible. Defendant yet again denied the pregnancy to the counselor, and also to her sister and a coworker.

On December 22, defendant worked at Sombrero's. Employees noticed she made repeated trips to the bathroom throughout her shift, and her final trip lasted several hours. When the restaurant manger knocked on the bathroom door to check on her, defendant said she was fine.

Defendant emerged from the bathroom hours later, carrying a trash bag, and she took it out the back door to a dumpster in the alley behind the restaurant. This was out of the ordinary because defendant usually put the trash she collected from the bathrooms in a trash can in the kitchen for one of the male workers to carry out to the dumpster. She also had blood on her pants, and there was blood on one of the toilet seats in the bathroom.

The restaurant manager called defendant's sister, Yuliana, to come and help defendant, and Yuliana and her husband responded. Defendant sat in their truck while Yuliana finished cleaning the restaurant. Yuliana asked defendant what had happened, and defendant told her she was menstruating and had gotten blood on her pants.

3

Defendant continued to bleed heavily the following day, and her brother took her to a hospital emergency room. At the emergency room, defendant repeatedly denied she had been pregnant or delivered a baby. Nevertheless, the physician who treated defendant concluded she had just given birth to a full-term baby. The physician contacted the police because he was concerned for the baby's welfare.

Investigating officers went to the restaurant and searched the bathroom and dumpster. In the dumpster, the officers found a clear plastic bag that contained the body of a baby girl, a placenta, and an umbilical cord. In the women's bathroom, the officers found a spot of blood underneath a toilet seat. DNA testing established it was defendant's blood underneath the toilet seat and in the bag with the discarded baby, and that defendant was the baby's mother.

When interviewed by the officers, defendant repeatedly denied knowing she was pregnant or that she had delivered a baby. She told them a ball of blood had come out of her vagina while she was at work, and that she got scared and threw the ball of blood into the trashcan.

At trial, the prosecution called Dr. Anthony Juguilon, a forensic pathologist. He opined defendant gave birth to a live, full-term and viable baby girl. The baby had numerous ante-mortem abrasions to her forehead, neck and chest, with the majority to her neck. The baby's lungs had aerated, which means she took some breaths before dying. The umbilical cord appeared to have been torn rather than cut. In his opinion, the baby died of asphyxia within minutes of birth.

*Defense Evidence*

Two witnesses testified defendant did not appear pregnant to them, and an emergency room nurse testified defendant cried when told she had been pregnant. Dr. Jody Ward, a clinical psychologist testified about pregnancy denial, the phenomena of a woman being pregnant but refusing to believe it. A woman who has pregnancy denial does not believe she is pregnant.

4

Dr. Paul Sinkhorn, a licensed and board certified OB/GYN who has either delivered or supervised the delivery of approximately 7,000 babies, testified that sometimes the baby's shoulders become arrested, which causes the baby to become stuck in the birth canal after the head has been delivered. If this happens, it is considered a medical emergency because the baby can die in a matter of minutes. This type of delivery also causes the mother significant pain and physical injury.

Dr. Sinkhorn also noted that according to the medical records in this case the baby's lungs were partially aerated, but also partially collapsed, which is consistent with a delivery involving arrested shoulders. And defendant suffered lacerations to her vulva and vagina during the delivery. He explained the presence of defendant's blood in the baby's mouth and nasal passages could have made it more difficult for the baby to breath.

Dr. Sinkhorn testified the baby's liver suffered lacerations consistent with an arrested shoulders delivery, and these injuries could be explained if the baby's chest was compressed while in the birth canal. He described the abrasions on the baby's body as superficial and consistent with fingernail scratches, which could have happened if the mother clawed at the baby's head and neck to free her from the birth canal. In Dr. Sinkhorn's opinion, the evidence was consistent with defendant having had a traumatic and difficult delivery without assistance.

Finally, Dr. Terri Haddix, a forensic pathologist testified the abrasions found on the baby's body were consistent with the mother having difficulty delivering the baby's shoulders after the head and neck were exposed. The baby's injuries were also consistent with an upward pulling from the base of the baby's neck up toward her chin.

Dr. Haddix agreed with Dr. Juguilon's conclusion the cause of death was asphyxiation due to compression of the neck. However, Dr. Haddix testified the totality of the circumstances supported a conclusion the baby's injuries were the result of pressure being exerted on her neck while the mother tried to pull her from the birth canal.

5

**DISCUSSION**

*1. Expert Testimony and Penal Code Section 29*

This case was actually tried twice. Judge Thomas M. Goethals presided over the first trial, which ended in a mistrial after the jury was unable to reach a verdict. In that trial, defense counsel asked Dr. Sinkhorn the following question: "Is [sic] the findings that you saw in this case, are they consistent with accidental physical injuries to a fetus occurring during a traumatic and difficult birth without the mother having any help?" The prosecutor objected citing Penal Code section 29 (section 29), and Judge Goethals sustained the objection.

Judge Singer presided over the second trial, which resulted in this appeal. In this trial, defense counsel wanted to ask Dr. Sinkhorn: "Is the evidence in this case consistent with accidental physical injuries to a fetus occurring during a traumatic and difficult delivery without the mother having any help?" Since this question was essentially the same as the question to which Judge Goethals had sustained the prosecutor's objection, defense counsel asked Judge Singer to reconsider that ruling.

Judge Singer responded, "I see the problem in the same context that Judge Goethals saw [it]. And that is that that reference to accidental does then allow the expert to opine that this was a deliberate act on the part of the defendant or a non-deliberate act on the part of the defendant. And that would be improper for him to do with the jury." Judge Singer clarified, "Just to be clear on this record, if you did ask the question the same way as it appears [in the first trial transcript], and there was an objection to that question, I would sustain the objection."

We review rulings under section 29 for abuse of discretion. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 663.) Defendant argues the court erred, because the proposed question did not concern defendant or her mental state. The Attorney General argues the court did not err, because the proposed question concerned defendant's mental state at the time the fetus was injured. Defendant is correct.

6

Section 29 states in relevant part, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged."

Both parties cite cases which discuss the parameters of permissible expert testimony under section 29, when a mental health expert is testifying about a defendant's mental illness, mental disorder, or mental defect. But in this case, the only expert testifying about any mental illness, mental disorder, or mental defect was Dr. Ward, the clinical psychologist who testified about pregnancy denial.

Dr. Sinkhorn, the OB/GYN expert, was testifying about arrested shoulder delivery, and whether the evidence in this case was consistent with a traumatic and difficult delivery, without any assistance. Besides, the proposed question sought Dr. Sinkhorn's opinion about the baby's physical injuries not defendant's mental state. Consequently, the proposed question did not contravene section 29.

Additionally, the section 29 ruling constituted an abuse of discretion, since it transgressed the confines of the applicable principles of law. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) But we need not decide whether the erroneous section 29 ruling alone was prejudicial, because we reverse based on instructional error and cumulative prejudice which are discussed *infra*.

2. *Lesser Included Offense Instructions*

Regarding count 1, "Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. [Citation.] The mens rea for murder is specific intent to kill [express malice] or conscious disregard for life [implied malice]. [Citation.] Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter. [Citations.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.)

7

There are two theories of involuntary manslaughter which are relevant in this case. Both of these theories are codified in Penal Code section 192, subdivision (b), which states the offense is (1) a killing "in the commission of an unlawful act, not amounting to felony," or (2) a killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." The first theory is commonly referred to as "misdemeanor" involuntary manslaughter, while the second theory is sometimes referred to as "lawful act" involuntary manslaughter.

Both of these theories of involuntary manslaughter as a lesser included offense to murder are covered by the standard form of CALCRIM No. 580, which states in relevant part: "The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2. The defendant committed the (crime/ [or] act) with criminal negligence; AND [¶] 3. The defendant's acts caused the death of another person." (CALCRIM No. 580.)

In this case, the court instructed the jury on second degree murder using CALCRIM No. 520, and the lesser included offense of involuntary manslaughter on a lawful act theory using a modified form of CALCRIM No. 580, but not the lesser included offense of involuntary manslaughter on a misdemeanor theory.

The modified form of CALCRIM No. 580 actually given on the lesser included offense of involuntary manslaughter states in relevant part: "The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed a lawful act in an unlawful manner; [¶] 2. The defendant committed the act with criminal negligence; and [¶] 3. The defendant's act unlawfully caused the death of another human being."

Regarding count 2, simple assault (Pen. Code, § 240) is a lesser included offense of assault on a child with force likely to produce great bodily injury causing death (Pen. Code, § 273ab(a)). (CALCRIM No. 820, Lesser Included Offenses.) For count 2 the court instructed the jury on the charged offense, but not the lesser included offense.

8

Defendant argues the court erred by failing to instruct sua sponte on involuntary manslaughter on a misdemeanor assault theory, as a lesser included offense to count 1; and on misdemeanor assault, as a lesser included offense to count 2. The Attorney General acknowledges the court's sua sponte duty to instruct on all lesser included offenses supported by substantial evidence (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155), but argues the evidence does not support giving either of the omitted lesser included offense instructions in this case.

We review failure to instruct on lesser included offenses de novo (*People v. Licas* (2007) 41 Ca1.4th 362, 366), and consider the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Ca1.App.4th 1122, 1137.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial . . . ." (*People v. Blair* (2005) 36 Cal.4th 686, 745, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 920.) Substantial evidence is evidence from which a jury of reasonable persons could conclude the defendant committed the lesser offense but not the greater. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)

Applying these principles here, we believe the evidence was sufficient for the jury to have concluded defendant committed both of the omitted lesser offenses, but not the charged greater offenses. "As noted, the trial court did not instruct on misdemeanor manslaughter—an unlawful killing without malice in the commission of an unlawful act not amounting to felony." (*People v. Lee* (1999) 20 Cal.4th 47, 60-61.) The misdemeanor act is simple assault, which is also a lesser included offense to count 2.

The elements of simple assault are: (1) defendant did an act that by its nature would directly and probably result in the application of force to a person; (2) defendant did that act willfully; (3) when defendant acted, she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone; and (4) when defendant acted, she had the present ability to apply force to a person. (CALCRIM No. 915.)

9

All of the elements of simple assault are supported by substantial evidence here. Again Dr. Sinkhorn testified the injuries to the baby's neck appeared to be fingernail scratches, consistent with defendant clawing at the baby's head and neck while trying to pull her out of the birth canal. Similarly, Dr. Haddix testified the cause of death by asphyxiation was consistent with defendant exerting pressure on the baby's neck by pulling upward from the base while defendant tried to free her from the birth canal.

Based on this evidence, a reasonable jury could have concluded that by applying force to the baby's head and neck during a difficult delivery, defendant was guilty of simple assault, but not second degree murder or assault on a child with force likely to produce great bodily injury causing death. Under these circumstances, the court erred by failing to instruct the jury on involuntary manslaughter on a misdemeanor assault theory, as a lesser included offense to count 1; and on misdemeanor assault, as a lesser included offense to count 2.

We assess erroneous misdirection of a jury, including failure to instruct on one of several lesser included offense theories, on the basis of the entire cause, including the evidence, to determine if the error resulted in a miscarriage of justice. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 174.) The error does so only if it appears reasonably probable a result more favorable to the defendant would have been reached absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

In this case, it appears reasonably probable a result more favorable to defendant would have been reached on both counts absent the error. As discussed, there is substantial evidence defendant simply assaulted the baby by applying force to the head and neck. Moreover, the prosecution's own expert, Dr. Juguilon, could not conclusively state whether the baby died during or after delivery. Plus the first jury heard essentially the same evidence and almost evenly deadlocked on both counts. The second jury might not have convicted her either if they had been properly instructed.

Regarding count 1, the Attorney General responds that because the jury found defendant guilty of second degree murder and rejected involuntary manslaughter on a lawful act theory, it is also reasonably probable the jury would have rejected involuntary manslaughter on a misdemeanor assault theory. We disagree for two reasons.

First, whether the jury would have rejected involuntary manslaughter on a misdemeanor assault theory is the wrong standard of review. Even if it was reasonably probable the jury would have rejected the misdemeanor assault theory, reversal is still required under *Watson* as long as there is also a "reasonabl[e] probab[ility]" that it affected the verdict. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Our Supreme Court has "made clear that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. [Citations.]" (*College Hospital Inc. v. Superior Court* (1994) 8 Ca1.4th 704, 715.)

Second, while the mens rea for involuntary manslaughter on both the lawful act and misdemeanor theories is criminal negligence (*People v. Butler*, *supra*, 187 Ca1.App.4th at pp. 1006-1008), criminal negligence is insufficient to establish the mental state required for assault. (*People v. Williams* (2001) 26 Cal.4th 779, 788.) Rather, "a defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its *natural and probable consequences*.' [Citation.]" (*Id.* at p. 787, italics added.)

And that mental state is problematic in this case, because we cannot tell whether the second degree murder verdict here was based on express or implied malice. The prosecutor argued both theories. As a result, we do not know whether the jury found defendant actually "intended to kill," or only "intentionally committed an act; [¶] . . . [t]he *natural and probable consequences* of [which] were dangerous to human life." (CALCRIM No. 520, italics added.) Of course, the former would necessarily be inconsistent with involuntary manslaughter on either a lawful act or misdemeanor assault theory, but the latter would not.

11

What's more, the implied malice theory of second degree murder presents a close question relative to involuntary manslaughter on a misdemeanor assault theory, because the natural and probable consequences doctrine is a feature of both offenses. But the implied malice theory presents no such close question relative to involuntary manslaughter on a lawful act theory, because the natural and probable consequences is not a feature of both offenses. (Compare CALCRIM Nos. 520 and 580.)

Regarding count 2, the Attorney General merely argues there is substantial evidence to support a conviction for assault with force likely to produce great bodily injury causing death, but not simple assault. Again we disagree. Viewing the evidence in the light most favorable to defendant as we must, there is also substantial evidence to support a conviction for simple assault. And once more, there is a reasonable chance (i.e., more than an abstract possibility) the jury would have reached that result if given the opportunity to do so.

*3. Cumulative Prejudice*

Finally, defendant contends even if the evidentiary and instructional errors individually do not require reversal, the cumulative prejudice resulting from those errors does require reversal. Again we agree.

Defendants are entitled to "'fair trials'" not "'perfect ones.'" (*People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) However, individual errors which might otherwise be harmless can "rise by accretion to the level of reversible and prejudicial error." (*Hill*, at p. 844.)

This is precisely what happened here. The evidentiary and instructional errors together had a "negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill*, *supra*, 17 Cal.4th at p. 847.) Collectively, the errors limited defendant's ability to fully present a defense which was otherwise viable based on the evidence.

12

(*People v. Cortes* (2011) 192 Cal.App.4th 873, 891-913.)  As a result, defendant did not receive a fair trial.  Accordingly, the judgment must be reversed.

## DISPOSITION

The judgment is reversed.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.